279 P.2d 454

Margaret JARDINE et al., Plaintiffs and Appellants,

v.

Archulius ARCHIBALD et al., Defendants and Respondents,

and

Margaret JARDINE et al., Plaintiffs and Appellants,

v.

Wallace BUTTARS et al., Defendants and Respondents.

Nos. 8177, 8178.

Supreme Court of Utah.

Jan. 24, 1955.

All the parties to these actions are children or grandchildren of decedent. At the trial of these cases it was stipulated by all the parties that the transcript of the evidence in the will contest case of In re Buttars Estate could be considered in the instant cases by the trier of the facts. In that case this court held that the contestants had failed to sustain their burden of proof that Emma G. Buttars, the testatrix, lacked testamentary capacity at the time of making the will. In re Buttars' Estate, Utah, 261 P.2d 171. See this case also for a statement of the evidence in that case to which the stipulation we have mentioned above referred. Some of the transfers of the property took place a short time after the execution of the will.

In addition to the evidence admitted in the will contest case there was introduced evidence that when the transfers of the real properties were made to respondents, the respective grantees took the mother to a notary public in Logan to have the deeds prepared and executed. The various transfers were made in 1945 and 1948 and were recorded within a short time of their execution, although appellants herein had no actual knowledge of these transfers until 1950. There was also more evidence from witnesses who were not parties to these actions that decedent had made declarations that the older children had received land from their father and that she was going to make it up to the younger children. When dece-

L. Delos Daines, Salt Lake City, George C. Heinrich, Logan, for appellant.

George D. Preston, L. E. Nelson, Logan, for respondent.

WADE, Justice.

These two suits which were consolidated for trial and on the appeal here, were brought by the plaintiffs, the appellants herein, to set aside on the grounds of fraud and undue influence, transfers of real and personal property by Emma G. Buttars, now deceased, to her youngest children.

dent's safety deposit box in the bank was opened after her death there were found in envelopes addressed to her daughters Archulius and Hattie, statements signed by decedent and attached to United States Savings Bonds, in which Archulius Archibald and Hattie Hodge were named as co-owners, to the effect that these bonds and some bank stock she attempted to give were being given to them by her because some stock which had been distributed to them from their father's estate had turned out to be worthless. All the children living in Clarkston saw their mother frequently but Archulius and Wallace saw her more often than the others. Archulius was the daughter who helped her mother in most of her little chores, such as keeping the family record, getting groceries and running little errands. Wallace took care of the finances and operated the farm for his mother. When the mother was unable to take care of her home alone, all the daughters took turns taking care of it. At first they took no pay for this, but a year before her final illness they were each paid for the work they did thereafter in their mother's home.

The court as the trier of the facts found that decedent at the time of all the transfers involved herein had a sound and disposing mind and knew what she was doing. That no fraud or undue influence was used by any person to persuade or compel the transfers, and that they were made because decedent believed the recipients of her gifts had not received a share equal to the other children from their father's estate and she desired to equalize what she considered to have been an unfair distribution of that estate. The court also found that there was a close and confidential relationship between decedent and all her children and that neither Archulius nor Wallace took advantage of this close and intimate relationship with their mother to unduly persuade or influence her in their favor and thus obtain the gifts made to them.

Appellants argue that because decedent was 80 years old before she made any transfers of her property, whereas prior to that time she had very carefully avoided making any substantial gifts to anyone and because she had been suffering from high blood pressure, hardening of the arteries and headaches, being forgetful at times and even eccentric, that these were all indications of senility and lack of mental capacity. They further argue that these facts, indicating lack of mental capacity, combined with the confidential relationship existing between decedent and the donees, were sufficient to prove undue influence and that thereupon the burden of proving mental capacity of decedent at the time the transfers were made and that she was not unduly influenced shifted to respondents. They contend the evidence shows the respondents failed to sustain this burden and the court therefore erred in finding that decedent did not lack mental capacity and was not acting under fraud or any undue

influence of anyone at the times she made the transfers.

◼◼ As to the mental capacity of the decedent there was medical testimony that up until her last and fatal illness she had a clear mind and knew and understood what she was doing. This was also borne out by testimony of disinterested witnesses who had occasion to see her during her lifetime. This was sufficient evidence from which the court could reasonably find as it did that decedent did not lack mental capacity at the times the transfers were made even though she was aged and had developed some eccentricities. However, since the court found as a fact that a confidential relationship existed between the decedent and the donees, and since the evidence clearly sustains such a finding, the question of whether such donees had sustained their burden of proving lack of fraud or undue influence is more difficult of solution.

◼ It is well settled that where a fiduciary or confidential relationship exists between the donor and donee, equity raises a presumption against the validity of such transactions and the burden is cast upon the donee to prove their validity and that there was no fraud or undue influence by proving affirmatively and by clear and convincing evidence compliance with equitable requisites. This is so because there is implied in every fiduciary or confidential relationship a superiority held by one of the parties over the other. See Pomeroy's Equity Jurisprudence, 5th Ed. Vol. 3, Sec. 956, page 790. Whether the donee has sustained his burden of proof necessarily depends upon the facts adduced in each case. Appellants argue that it is clear that respondents have failed to sustain their burden of proof because even if it were not unreasonable to find from the evidence that there was no fraud or undue influence there is no evidence that decedent had independent advice before she made any of the transfers and without such advice it is impossible to prove good faith and lack of undue influence where a fiduciary relationship exists. In support of this contention they cite such cases for example as Overstreet v. Beadles, 151 Kan. 842, 101 P.2d 874; Beals v. Ares, 25 N.M. 459, 185 P. 780 and Ham v. Ham, 146 Miss. 161, 110 So. 583, on page 585, in which latter case the court said:

"The usual method of proving independent consent and action in such cases, and probably the only way it can be clearly proven, is by showing that in making the deed the grantor acted on the advice of a competent person, disconnected from the grantee and devoted wholly to the grantor's interest. * * * "

◼ Appellants also cite Omega Investment Co. v. Woolley, 72 Utah 474, 271 P. 797 as placing Uath with the jurisdictions holding that independent advice is necessary to sustain a transaction where a fiduciary relationship exists. We do not understand that case to have so held. That case involved transactions between an agent and

his principal and the court found as facts that the agent had overreached the principal and had taken advantage of the confidence placed in him by the principal and that the evidence failed to show that the agent had made a full and fair disclosure of all facts within his knowledge. That the principal had not entered into the transactions being fully and freely advised, nor did the evidence show that an adequate consideration had been paid for the contracts and property involved. All these elements were taken into consideration by the court in determining that the agent had failed to sustain his burden of proof. Of course, among the elements which might be of great importance in most cases in determining alleged undue influence where a confidential relationship exists, is whether independent advice had been received by the donor, and in some instances without such proof the donee might not be able to sustain his burden of proving good faith. Pomeroy's Equity Jur. 5th Ed., Sec. 956, pages 796-98 states the rule thus:

"There are a number of cases which lay down the rule generally that, in order to rebut the presumption of undue influence or unfairness arising from the fact that the parties to a transaction stood in a confidential or fiduciary relation, it is necessary to show that the one reposing confidence acted upon independent advice. However, in most jurisdictions where the question has arisen it appears that the courts have not laid down any such hard and fast rule. The question as to whether such independent advice is essential is ordinarily determined with respect to the nature of the confidence reposed, the nature of the transaction, and the circumstances in each particular case. In other words, a rule requiring proof of independent advice is ordinarily applied where it is a reasonable requirement and where the circumstances are such that it would be difficult to show the fairness of the transaction without proof of independent advice. The rule is peculiarly applicable in gift cases, * * * it would seem that proof of independent advice is not indispensable where other satisfactory evidence is available to show that there was no abuse of confidence and that the transaction was fair and free from the undue influence inferred from the relationship."

To the same effect see the Annotation in 123 A.L.R. commencing on page 1505.

■ The court having found that there was no fraud or undue influence, the question we have to determine is: was there clear and convincing evidence from which the court could so conclude. See Pomeroy's Eq. Jur. 5th Ed. Sec. 957, page 799 where the author states in continuing on the subject expressed in Sec. 956 quoted above:

"The first class includes all those instances in which the two parties con-

sciously and intentionally deal and negotiate with each other, each knowingly taking a part in the transaction, and there results from their dealing some conveyance, or contract, or gift. To such cases the principle literally and directly applies. The transaction is not necessarily voidable, it *may* be valid; but a presumption of its invalidity arises, which can only be overcome, if at all, by clear evidence of good faith, of full knowledge, and of independent consent and action."

■ In Greener v. Greener, 116 Utah 571, 212 P.2d 194 on pages 204–205, this court speaking through Mr. Justice Wolfe in defining what quantum of proof is needed to be clear and convincing said:

"* * * That proof is convincing which carries with it, not only the power to persuade the mind as to the probable truth or correctness of the fact it purports to prove, but has the element of clinching such truth or correctness. Clear and convincing proof clinches what might be otherwise only probable to the mind. * * *

"But for a matter to be clear and convincing to a particular mind it must at least have reached the point where there remains no serious or substantial doubt as to the correctness of the conclusion. * * *"

■ The evidence was uncontradicted that when decedent was about 80 years old and after her first serious illness and at a time when she had an opportunity for independent advice, she executed a Will in which she left her estate in equal portions to all of her living children and stated that she was not remembering the children of a son who had passed away in the same manner because she had loaned that son money which had not been repaid and thus he had received his share of her estate. Within a very short time after making this Will she made her first transfers of real estate to her two youngest children with whom her association was closer than with her other children. At the time these transfers were made, the recipients of her bounty took her to a notary public for those purposes. All of these facts might have lent credence to a finding of undue influence had the trier of the facts so found. However, the trier of the facts found there was no fraud or undue influence involved in any of the transfers. In favor of such findings, the evidence discloses a picture of a woman who was always strong-minded and the head of her household after her husband's death. As she grew older, as is usual, she became more set in her ways and even developed some eccentricities, but in her business dealings knew exactly what she wanted. She had made statements to friends and neighbors which indicated that she did not feel that the youngest children had obtained an equitable share of their father's estate since the father had given some of the older sons some real property before he died and

furthermore some stock which had been distributed to the younger daughters from his estate had later become worthless, and therefore she was going to make it up to them. These statements were made before her first serious illness. That she was of the same mind years later after her illness is proved by her written statements attached to the envelopes in which she had placed United States Savings Bonds and the bank stock for her daughters, in which she gave as her reason for favoring them that some stock which had been distributed to them from their father's estate had proved worthless. The bonds were bought and the attempted transfers of the bank stock were made in 1950, five years after the execution of the Will. (The court found these transfers to be invalid.) There was no evidence that the beneficiaries knew anything about these transactions. However, the evidence was uncontradicted that the conveyances were recorded by the beneficiaries shortly after their execution and that appellants had actual knowledge of them in 1950, two years before their mother passed away. In view of all the evidence and these circumstances it was not unreasonable for the trier of the facts to have had no "serious or substantial doubt" that the transfers were made in good faith, with full knowledge and independent consent and action, and not because of the overcoming of the Will of the donor by some third person, i.e., by fraud or undue influence. See Mehlbrandt v. Hall, 121 Colo. 165, 213 P.2d 605, for a discussion of the weight to be given the court's findings of fact where supported by the evidence.

Affirmed. Costs to respondents.

McDONOUGH, C. J., and HENRIOD and WORTHEN, JJ., and COWLEY, District Judge, concur.

CROCKETT, J., having disqualified himself, did not participate herein.